1          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEBRASKA
2

3    UNITED STATES OF AMERICA,      )
                                    )
4           Plaintiff,              )         8:10CR248
                                    )
5        vs.                        )
                                    )      Omaha, Nebraska
6    DIABLO S. WILLIAM,             )        July 5, 2011
                                    )
7           Defendant.              )

8

9            TRANSCRIPT OF SENTENCING PROCEEDINGS
           BEFORE THE HONORABLE LAURIE SMITH CAMP
10                UNITED STATES DISTRICT JUDGE

11
                    A-P-P-E-A-R-A-N-C-E-S
12

13   FOR THE PLAINTIFF:          Mr. John E. Higgins
                                 Asst. United States Attorney
14                               1620 Dodge Street
                                 Suite 1400
15                               Omaha, NE 68102

16   FOR THE DEFENDANT:          Mr. Glenn A. Shapiro
                                 Attorney at Law
17                               1001 Farnam Street
                                 Third Floor
18                               Omaha, NE 68102

19

20

21   COURT REPORTER:            Ms. Brenda L. Fauber, RDR, CRR
                                111 South 18th Plaza
22                              Suite 3129
                                Omaha, NE 68102
23                              (402) 661-7322

24      Proceedings recorded by mechanical stenography,
     transcript produced with computer.
25

1       (At 1:35 p.m. on July 5, 2011, with counsel for the

2    parties and the defendant present, the following proceedings

3    were had:)

4           THE COURT:  We are here in the matter of the United

5    States versus Diablo William.  It's Case Number 8:10CR248.

6       Will counsel please enter their appearances.

7           MR. HIGGINS:  John Higgins for the United States.

8    With me at counsel table is the case agent, FBI Special Agent

9    Paris Capalupo.

10          THE COURT:  Very good.  Good afternoon to both of

11   you.

12          MR. SHAPIRO:  Judge, good afternoon; I'm Glenn

13   Shapiro present with Mr. William.

14          THE COURT:  And good afternoon to you as well.

15          THE DEFENDANT:  Good afternoon.

16          THE COURT:  The matter before the Court at this time

17   is the sentencing.

18       The defendant entered a plea of guilty to Counts I and II

19   of the indictment.  There is no plea agreement in this case.

20   I accepted the defendant's plea.

21       And Mr. Higgins, have you received the presentence

22   report, specifically the revised presentence investigation

23   report, and the Court's tentative findings?

24          MR. HIGGINS:  I have, your Honor.

25          THE COURT:  And Mr. Shapiro, have you received those

1    documents and discussed them with your client?

2              MR. SHAPIRO:  Judge, I did, and we did discuss them.

3              THE COURT:  The government addressed the presentence

4    investigation report at filing 44 indicating certain

5    objections based upon additional information that had come to

6    light while the defendant was on release status pending

7    sentencing.  And that is going to be what we're addressing

8    this afternoon through an evidentiary hearing.

9         The defendant raised objections to the presentence

10   investigation report as well regarding absence of acceptance

11   of responsibility, and again the matters that the government

12   had raised concerning alleged obstruction of justice due to

13   the defendant's conduct or alleged conduct while awaiting the

14   sentencing.

15        And in the tentative findings I noted that we would be

16   hearing evidence this afternoon regarding the acceptance of

17   responsibility issue and the obstruction of justice issue.

18   These relate to paragraphs 18, 26 and 29 in the revised

19   presentence investigation report.

20        So, have I fairly described the issues that remain, the

21   acceptance of responsibility and the obstruction of justice

22   issue, Mr. Shapiro?

23             MR. SHAPIRO:  You have, your Honor.

24             THE COURT:  All right?

25        Mr. Higgins?

1    MR. HIGGINS:  Yes, Judge.

2       The United States recognizes that the underlying driver,

3    so to speak, of the defendant's guideline calculation is

4    career offender.  And the United States' position is that he

5    should receive a two-level enhancement or increase for

6    obstruction.  That really gets subsumed within the career

7    offender.  As I understand, there's no objection -- or no

8    issue with respect to whether he does qualify as a career

9    offender.

10       So, that said, I believe that the evidence that concerns

11   the obstruction, I don't think that's going to affect his

12   guideline calculation as such because it's subsumed within the

13   career offender.  Nonetheless, I think it's relevant to

14   whether or not he's accepted responsibility.  And I think it's

15   also relevant to the Court's exercise of its discretion under

16   3553(a).

17       So, I recognize that also it's United States' burden with

18   respect to the obstruction enhancement.  It's the defendant's

19   burden with respect to acceptance of responsibility.  And so

20   I'm willing to go first, if that's the Court's pleasure; or to

21   respond, whichever makes the most sense.  But we're prepared

22   to go forward either way.

23       THE COURT:  All right.  Well, I think it makes more

24   sense for the government to go first.

25       But Mr. Shapiro, do you have a preference?

1          MR. SHAPIRO:  I agree with you, Judge.

2          THE COURT:  All right.

3      Mr. Higgins, then it is up to you.  And even though with

4  respect to acceptance of responsibility it's the defendant's

5  burden, you will be asked to come forward with the evidence to

6  support your position.  And then we'll hear any evidence the

7  defendant may have, and we'll hear argument.

8          So you may proceed with your evidence.

9          MR. HIGGINS:  Thank you, your Honor.

10      United States calls Special Agent Capalupo.

11          THE COURT:  If you'll come forward to the courtroom

12  deputy, she'll swear you in.

13          COURTROOM DEPUTY:  State your full name for the

14  record, please, and spell your last name.

15          THE WITNESS:  Paris Capalupo, C-a-p-a-l-u-p-o.

16          PARIS CAPALUPO, PLAINTIFF'S WITNESS, SWORN

17          THE COURT:  You may inquire.

18          MR. HIGGINS:  Thank you, your Honor.

19                          DIRECT EXAMINATION

20  BY MR. HIGGINS:

21  Q.   Could you tell us your full name, please, and spell your

22  last name as well?

23  A.   Paris Capalupo, C-a-p-a-l-u-p-o.

24  Q.   Who do you work for?

25  A.   The FBI.

1    Q.   In what capacity?

2    A.   I'm a special agent.

3    Q.   Were you involved in connection with your work with the

4    FBI in the underlying drug investigation concerning this

5    defendant, Diablo William?

6    A.   Yes, sir.

7    Q.   And did that involve a pair of controlled buys?

8    A.   Yes, sir.

9    Q.   During what period of time was it that you were

10   conducting your investigation, approximately, concerning

11   Mr. William?

12   A.   Approximately the end of March 2010 until about his

13   arrest in August of 2010.

14   Q.   I'm talking specifically concerning the drug case.

15   A.   Yes, sir.

16   Q.   All right.  During that period of time, did you have

17   occasion to see the defendant?

18   A.   Yes, sir.

19   Q.   Were you conducting surveillance from time to time?

20   A.   Yes, sir.

21   Q.   Saw him on at least one occasion then?

22   A.   Yes, sir.

23   Q.   And then the defendant, was he ultimately arrested on a

24   federal charge?

25   A.   He was, sir.

1   Q.   Did you have contact with him at that time?

2   A.   I did, sir.

3   Q.   Personal contact?

4   A.   Yes, sir.

5   Q.   Let me direct your attention then forward in time to

6   March of 2011, after the time your drug investigation had

7   ended.  Okay?

8   A.   Yes, sir.

9   Q.   In approximately March of 2011, did an Omaha Police

10  detective contact you?

11  A.   Yes, sir.

12  Q.   Who was that?

13  A.   It was Detective Jim Shields.

14  Q.   And what was the purpose of the contact?

15  A.   He was discussing a robbery case.  And he had information

16  that a robbery had occurred and he got word that this person

17  may look like Diablo William.

18       He ran Diablo's name, saw that I had a case against

19  Diablo and called me to talk about it.

20  Q.   All right.  Ultimately did you review some video that was

21  from the store where this purported robbery occurred?

22  A.   I did, at Detective Shields' office.

23  Q.   Do you have Exhibit 6 and 7 in front of you?

24  A.   Yes, sir.

25  Q.   Exhibit 6, is it your understanding that is a collection

1    of videos from the store where this purported robbery

2    occurred?

3    A.   Yes, sir.

4    Q.   And then Exhibit No. 7, are those excerpts of two camera

5    views from that same set of videos on Exhibit 6?

6    A.   Yes, sir.

7    Q.   All right.  Have you reviewed, before coming to court,

8    Exhibit No. 7 in particular?

9    A.   I did, sir.

10   Q.   All right.  And does it fairly and accurately depict

11   what's shown on there?

12   A.   Yes, sir.

13          MR. HIGGINS:  Offer 6 and 7.

14          MR. SHAPIRO:  There's no objection to 6 or 7, your

15   Honor.

16          THE COURT:  Exhibits 6 and 7 are received.

17   BY MR. HIGGINS:

18   Q.   Did you discuss with Detective Shields his investigation

19   of what it was he was trying to get you to identify?

20   A.   Yes.

21   Q.   Did you recognize any of the suspects from the video?

22   A.   I did.

23   Q.   Who?

24   A.   Diablo William.

25   Q.   And so that we can all have a reference to which person

1   it is on the video, can you give us an idea of what color top

2   Mr. William was wearing?

3   A.   It was a white sweatshirt.

4   Q.   All right.  And do you remember anything about his cap he

5   was wearing?

6   A.   It was a green colored cap, baseball style cap.

7   Q.   Do you recall anything about any lettering?

8   A.   It appeared to be Notre Dame, I think the sweatshirt was

9   a Notre Dame University shirt.

10  Q.   Are you able to identify the defendant today?

11  A.   Yes, sir.

12  Q.   Do you see him in the courtroom?

13  A.   Yes, sir, seated to my right wearing orange.

14       MR. HIGGINS:  I'd ask the record reflect the witness

15  has identified the defendant.

16       THE COURT:  The record will so reflect.

17       MR. HIGGINS:  No further questions of this witness.

18       THE COURT:  Cross-examination?

19            CROSS-EXAMINATION

20  BY MR. SHAPIRO:

21  Q.   Agent Capalupo, does any of the video or still camera

22  show the actual assault or robbery of the individual?

23  A.   No, sir.

24  Q.   Are you aware of the reports generated with respect to

25  the robbery investigation generally?

1    A.   Yes, sir, generally.

2    Q.   Are you aware of any witnesses that have my client

3    physically striking this party involved?

4    A.   I believe there's one witness in the report that I read,

5    sir.

6    Q.   Does that one witness indicate they saw the defendant

7    push the person down to the ground?

8    A.   Push or pull, something like that, down to the ground.

9    Q.   And are you aware that Mr. Diablo William has basically

10   stated his two friends and this third party were in some fight

11   and he went out to sort of break it up in some capacity and

12   that was his own involvement?

13   A.   That's what Mr. William stated to me, sir.

14   Q.   And aside from the one witness who said -- well, it's

15   important.  Did they say he saw my client strike this person

16   or maybe push him to the ground, the best you recall?

17   A.   Yeah, I'd have to look at the report, but it was either

18   push or strike to the ground.

19   Q.   If I told you it was push, would you have any serious

20   dispute with that?

21   A.   No, sir, if that's what's in the report, I'll agree with

22   that.

23   Q.   Possibly consistent with separating parties who were

24   fighting?

25   A.   Possibly.

1    Q.   Any information that my client took the wallet or any

2    money from the individual that was fighting with the other two

3    parties?

4    A.   Not that I know of, sir.

5    Q.   Thank you, Agent.

6            THE COURT:  Redirect?

7            MR. HIGGINS:  None.

8            THE COURT:  All right.

9        Thank you, Agent.  You may stand down.

10           THE WITNESS:  Thank you, your Honor.

11           THE COURT:  Any further witnesses, Mr. Higgins?

12           MR. HIGGINS:  United States calls Detective Jim

13   Shields.

14           THE COURT:  If you'll come to the courtroom deputy,

15   she'll swear you in.

16           MR. HIGGINS:  May I approach the witness stand?

17           THE COURT:  Yes, you may.

18           COURTROOM DEPUTY:  State your full name for the

19   record, please, and spell your last name.

20           THE WITNESS:  Jim Shields, S-h-i-e-l-d-s.

21            JIM SHIELDS, PLAINTIFF'S WITNESS, SWORN

22           THE COURT:  You may inquire.

23           MR. HIGGINS:  Thank you, your Honor.

24                       DIRECT EXAMINATION

25   BY MR. HIGGINS:

1    Q.   Please tell us your full name and spell your last name as

2    well.

3    A.   Jim Shields, S-h-i-e-l-d-s.

4    Q.   Who do you work for?

5    A.   Omaha Police Department.

6    Q.   In what capacity?

7    A.   I'm a detective in our major crimes unit.

8    Q.   How long have you been with the Omaha Police Department?

9    A.   Sixteen years.

10   Q.   Your current assignment you said was with the major

11   crimes task force?

12   A.   Major crimes unit.

13   Q.   Major crimes unit, pardon me.

14        How long have you been in that current position?

15   A.   Two and a half years.

16   Q.   And can you give us an idea of what sorts of duties you

17   have in your current position?

18   A.   The main job with that unit is investigating bank

19   robberies.  After bank robberies, it's other business

20   robberies.  Then after that, it's serious felony crimes such

21   as assaults.

22   Q.   Let me direct your attention to February of this year and

23   ask were you involved in an investigation concerning an

24   alleged robbery?

25   A.   Yes.

1   Q.   Was that a robbery purported to have occurred on February

2   23 of this year?

3   A.   Yes.

4   Q.   The victim or victims in that case, were they private

5   individuals or was that a business?

6   A.   They were private individuals.

7   Q.   All right.  And are you aware of specifically what their

8   names are?

9   A.   Yes, sir.

10  Q.   All right.  I'm going to refer to these two reported

11  victims as Victim 1 and Victim 2, all right?

12  A.   Yes.

13  Q.   Can you tell us the race and gender of the two reported

14  victims?

15  A.   They were both white males.

16  Q.   Can you tell us what, if anything, was reported to have

17  been taken and from whom?

18  A.   Victim number 1 is named ████████████.  He reported that

19  a wallet was taken from him that contained his Nebraska

20  license, a credit card and also $900 in cash.

21  Q.   Now I realize that in your reports you list names of

22  victims; is that right?

23  A.   Yes.

24  Q.   For purposes of today's hearing, let's refer to the first

25  person as Victim 1 and second one as Victim 2, all right?

1    A.    Yes.

2    Q.    All right.  So Victim 1 reported a wallet being taken?

3    A.    Yes.

4    Q.    All right.  Did Victim 1 also report any physical

5    assault?

6    A.    Yes.

7    Q.    Did you or other officers take photographs of

8    specifically Victim 1?

9    A.    Our crime -- personnel from our crime lab took

10   photographs.

11   Q.    Now, do you have a series of exhibits in front of you?

12   A.    Yes.

13   Q.    Could you flip to Exhibits 4 and 5?

14   A.    (The witness complies.)  I have them.

15   Q.    Do you know what they are?

16   A.    Yes.

17   Q.    What are they?

18   A.    They're photographs of Victim Number 1 after the assault

19   and robbery.

20   Q.    Do they fairly and accurately depict what's shown on

21   there?

22   A.    Yes.

23              MR. HIGGINS:  Offer Exhibits 4 and 5.

24              MR. SHAPIRO:  No objection to those two exhibits,

25   your Honor.

1          THE COURT:  Exhibits 4 and 5 are received.

2     BY MR. HIGGINS:

3     Q.   Are you aware of whether this person I'm calling Victim 1

4     reported any particular physical injuries?

5     A.   Yes.

6     Q.   What?

7     A.   He sustained an orbital fracture to his right eye socket.

8     Q.   Now this incident, did it take place at a business?

9     A.   In the parking lot of a business.

10    Q.   All right.  What was the name of the business?

11    A.   Tobacco & Phones 4 Less.

12    Q.   Do you have Exhibit No. 1 in front of you?

13    A.   Yes, sir.

14    Q.   What is Exhibit 1?

15    A.   A timeline of events.

16    Q.   And does that summarize some of the events from your

17    investigation and the other sequence of events in connection

18    with this reported robbery?

19    A.   Yes, sir.

20    Q.   And have you reviewed it before coming to court --

21    A.   Yes, sir.

22    Q.   -- excuse me, have you reviewed it today?

23    A.   Yes.

24    Q.   And does it appear to you to be accurate?

25    A.   Yes.

1                    MR. HIGGINS:  Offer Exhibit 1.

2                    MR. SHAPIRO:  No objection to 1, your Honor.

3                    THE COURT:  Exhibit 1 is received.

4      BY MR. HIGGINS:

5      Q.   Now, I take it you and other officers did reports in

6      connection with your investigation.

7      A.   Yes.

8      Q.   Do you have Exhibit 2 in front of you?

9      A.   Yes.

10     Q.   Is that a report that you authored?

11     A.   Yes.

12     Q.   Does that summarize various aspects of your

13     investigation?

14     A.   Yes, it does.

15                   MR. HIGGINS:  Offer Exhibit 2.

16                   MR. SHAPIRO:  No objection to 2, your Honor.

17                   THE COURT:  Exhibit 2 is received.

18     BY MR. HIGGINS:

19     Q.   And then turning to Exhibit 3, do you have that?

20     A.   Yes.

21     Q.   Is that an officer by -- excuse me, a report by another

22     officer?

23     A.   Yes.

24     Q.   And does it summarize portions of the investigation

25     conducted by that officer?

1    A.   Yes.

2              MR. HIGGINS:  Offer Exhibit 3.

3              MR. SHAPIRO:  There is no objection to 3, Judge.

4              THE COURT:  Exhibit 3 is received.

5    BY MR. HIGGINS:

6    Q.   We've heard testimony concerning a video.  Are you aware

7    of whether or not a video was obtained from this Tobacco &

8    Phones 4 Less?

9    A.   Yes.

10   Q.   Is it your understanding that -- strike that.

11             MR. HIGGINS:  May I approach the witness?

12             THE COURT:  You may.

13   BY MR. HIGGINS:

14   Q.   I've placed in front of you Exhibit 6 and 7 which have

15   been received in evidence.

16        Exhibit 6, is it your understanding that's a compilation

17   of videos from the store?

18   A.   Yes.

19   Q.   And Exhibit 7, is that a pair of excerpts from the video

20   on Exhibit 6?

21   A.   Yes.

22   Q.   Did you meet with Agent Capalupo during the course of

23   your investigation, show him video?

24   A.   Yes, I did.

25   Q.   As a result of that identification, did you piece that

1    information together with any other information you had from

2    your investigation?

3    A.    I don't understand the question.

4    Q.    Yeah, that was a pretty poor question.  Let me try that

5    again.

6          Did you use the information you gained from Agent

7    Capalupo in conjunction with the other information you had

8    gained in your investigation, the photos, the video, etc.?

9    A.    Yes.

10   Q.    And are you aware of whether an arrest warrant was issued

11   for the defendant?

12   A.    Yes, and there was.

13   Q.    What was the nature of the warrant?

14   A.    Robbery.

15   Q.    Was there a probable cause finding by a judge as far as

16   you know?

17   A.    Yes, there was.

18   Q.    Was the defendant arrested?

19   A.    Yes.

20   Q.    Approximately when did that happen?

21   A.    March 9th, 2011.

22   Q.    Let me turn your attention back to the video for a

23   moment, if I may.

24         How many suspects were there from your investigation in

25   this robbery?

1    A.    Three.

2    Q.    What race and gender were they?

3    A.    They were all black males.

4    Q.    In order to distinguish them on the video, could you

5    describe for us the color of the top that each of them was

6    wearing?

7    A.    Yes.  The first one was wearing a white Notre Dame

8    sweatshirt.  The second one was wearing a red T-shirt, along

9    with a red baseball style cap.  The third one was wearing a, I

10   guess, tan or brownish hooded jacket.

11   Q.    During the investigation did you yourself speak to any

12   purported eyewitnesses?

13   A.    Yes.

14   Q.    Did you speak with an individual named James Fitzgerald?

15   A.    Yes.

16   Q.    What connection, if any, did that person have to this

17   store where the incident occurred?

18   A.    Mr. Fitzgerald is an employee of the Tobacco & Phones 4

19   Less.

20   Q.    Where did Mr. Fitzgerald report that he was at the time

21   of the incident?

22   A.    Initially he was in the back room doing work.  He was

23   notified by another employee that there was a fight in the

24   parking lot.

25   Q.    What did Mr. Fitzgerald report that he did?

1    A.   He ran outside to the parking lot.

2    Q.   What did Mr. Fitzgerald report that he saw once he

3    arrived in the parking lot?

4    A.   He observed three black males assaulting a white male.

5    He said specifically when he was outside that the person he

6    saw wearing the white sweatshirt was throwing the victim to

7    the ground.

8    Q.   Okay.  Was it a push or a pull or a throw, or do you

9    recall?

10   A.   I recall a throw.  I can refer to my reports for an exact

11   wording.

12   Q.   All right.  What did Mr. Fitzgerald report occurred after

13   what he just saw that you related to us?

14   A.   After the victim was thrown to the ground, the three

15   suspects ran to a vehicle that they arrived in that was still

16   parked in the parking lot.

17   Q.   Did he report which of the three individuals, the three

18   suspects, was driving?

19   A.   Yes.

20   Q.   Which one was it?

21   A.   The person identified wearing the white sweatshirt.

22   Q.   And then the other two also got into this vehicle?

23   A.   Yes.

24   Q.   Now, Mr. Fitzgerald, was he able to pick out or identify

25   any of the three suspects from a photo lineup?

1    A.    He was not.

2    Q.    Let me refer you back to Exhibit 2 again, if I may.  Do

3    you have that?

4    A.    Yes, I have it.

5    Q.    Let me refer you to pages 5 and following.

6    A.    I'm at page 5.

7    Q.    Does your report include a timeline, so to speak, of the

8    sequence of events as depicted on the video?

9    A.    Yes, it does.

10   Q.    After the defendant's arrest, at some date thereafter,

11   did you have contact again with the defendant?

12   A.    Yes.

13   Q.    Actually did you interview him?

14   A.    Yes.

15   Q.    At whose request?

16   A.    At his request.

17   Q.    Did anyone accompany you?

18   A.    Special Agent Capalupo.

19   Q.    Was that on about March 14 of this year?

20   A.    Yes.

21   Q.    And did you draft a report summarizing your interview

22   with the defendant?

23   A.    Yes.

24   Q.    Do you have Exhibit 8 in front of you?

25   A.    Yes.

1    Q.   Is Exhibit 8 a summary -- excuse me, your report

2    summarizing your interview?

3    A.   Yes.

4              MR. HIGGINS:  Offer Exhibit 8.

5              MR. SHAPIRO:  No objection to 8, your Honor.

6              THE COURT:  Exhibit 8 is received.

7    BY MR. HIGGINS:

8    Q.   Did you also have contact with an individual at a later

9    date named Josh McCoy?

10   A.   Yes.

11   Q.   Was it about March 25 of this year when you had contact

12   with Mr. McCoy?

13   A.   Yes.

14   Q.   At whose request did that inter -- that contact occur?

15   A.   At Josh McCoy's request.

16   Q.   How did you first learn or find out the name Josh McCoy

17   in connection with this case?

18   A.   On March 24th I received a telephone call from the

19   Douglas County Attorney that was handling the case, Robert

20   MacTaggart.  He said a person had come into his office.  He

21   identified him as Josh McCoy and said that he was admitting to

22   the robbery that Diablo was arrested for.

23   Q.   So then the next day you have contact with Mr. McCoy?

24   A.   Yes.

25   Q.   Was that at his request?

1    A.    Yes.

2    Q.    Did anyone accompany you?

3    A.    My supervisor, along with Special Agent Capalupo.

4    Q.    Did you summarize your contact with Mr. McCoy in a

5    report?

6    A.    Yes.

7    Q.    Do you have Exhibit 9 in front of you?

8    A.    Yes, I do.

9    Q.    Is that your report concerning the interview with

10   Mr. McCoy?

11   A.    Yes, sir.

12         MR. HIGGINS:  Offer Exhibit 9.

13         MR. SHAPIRO:  No objection to 9, your Honor.

14         THE COURT:  Exhibit 9 is received.

15   BY MR. HIGGINS:

16   Q.    Your contact with Mr. McCoy, March 25, give or take, was

17   that about a month following this reported incident?

18   A.    Yes.

19   Q.    How did Mr. McCoy look to you?

20   A.    He was fine, no apparent injuries.  He didn't seem to be

21   under the influence of alcohol or drugs.

22   Q.    Did he have any lingering injuries like black eyes,

23   anything like that?

24   A.    No, sir.

25   Q.    Did you notice any scuffs, marks on his fists, knuckles,

1    anything like that?

2    A.   No.

3    Q.   Mr. McCoy, did he give you more than one version of

4    events, fair to say?

5    A.   Yes.

6    Q.   All right.  The first version of events Mr. McCoy

7    provided to you and the others who were present, did you

8    believe that version?

9    A.   No.

10   Q.   Why not?

11   A.   There was clear evidence that we had that shows McCoy's

12   statements did not coincide with the evidence that we had from

13   the scene.

14   Q.   And some of those contrasts, so to speak, between the

15   evidence and what Mr. McCoy was saying, are they summarized in

16   your report, Exhibit 9?

17   A.   Yes, sir.

18   Q.   Let me ask you in particular about your review of the

19   video and then your contact with Mr. McCoy, all right?

20   A.   Okay.

21   Q.   How did Mr. McCoy compare to any of the three suspects

22   that were shown in the videos that we've talked about, Exhibit

23   6 and 7?

24   A.   He's clearly not present in the video.

25   Q.   And I think it's been clear from what you've told us so

1    far that Mr. McCoy changed his story even during the interview

2    you had with him.

3    A.    That's correct.

4    Q.    Is that also reflected in your report, Exhibit 9?

5    A.    Yes, sir.

6    Q.    Let's turn our attention then to the next event, a

7    preliminary hearing.  Did you testify at a preliminary hearing

8    in state court concerning this same manner?

9    A.    Yes, I did.

10   Q.    Was that in Douglas County District Court?

11   A.    Yes.

12   Q.    Do you have Exhibit 10 in front of you?

13   A.    Yes, sir.

14   Q.    What is Exhibit 10?

15   A.    It's the transcript from the preliminary hearing that was

16   held on April 1st.

17   Q.    For what charge was the defendant -- let me try that

18   question over again.

19        What was the defendant charged with in connection with

20   the preliminary hearing?

21   A.    Robbery.

22   Q.    Do you know the result of the preliminary hearing?

23   A.    Yes.

24   Q.    What was it?

25   A.    He was bound over for district court.

1    Q.   On that charge?

2    A.   Yes, on the charge of robbery.

3         MR. HIGGINS:  Offer Exhibit 10.

4         MR. SHAPIRO:  No objection to 10, your Honor.

5         THE COURT:  Exhibit 10 is received.

6    BY MR. HIGGINS:

7    Q.   Now, following the defendant's arrest, do you know where

8    he was held in custody?

9    A.   Douglas County Corrections.

10   Q.   To your knowledge, has the defendant remained in custody

11   since the time of his arrest in early March?

12   A.   Yes.

13   Q.   Now, did you make some attempt to listen to jail calls in

14   connection with this defendant as part of your investigation?

15   A.   Yes, I did.

16   Q.   Are you familiar with the phone system at the Douglas

17   County jail?

18   A.   Yes.

19   Q.   Can you summarize for the Court how that system works?

20   A.   It's a computerized phone system.  The inmates can make

21   outgoing phone calls, either collect calls, or they can have

22   money put on their books.  And they can access their account

23   through their data number which is also their PIN number that

24   they use to make the phone calls, when they're making the

25   outgoing phone calls.

1    Q.   So is it fair to say there's a data or PIN number

2    associated with each inmate?

3    A.   Yes.

4    Q.   Now, have you made attempts in the past to listen to jail

5    calls in other cases with other defendants?

6    A.   Yes.

7    Q.   And in your experience, do inmates at the Douglas County

8    jail always use their own PIN number?

9    A.   No, they don't.

10   Q.   Why not?

11   A.   There's a -- on the recording when they make an outgoing

12   phone call, they're notified that the phone call is subject to

13   monitoring.  The inmates will often use other people's data

14   numbers to make outgoing calls when they think that -- or so

15   they think investigators can't listen to those phone calls

16   that are being made.

17   Q.   Now, did you actually make an attempt to listen to calls

18   that were associated with this defendant's PIN or data number?

19   A.   Yes.

20   Q.   And were you able to listen to some calls that actually

21   were associated with that PIN or data number?

22   A.   Yes.

23   Q.   The calls that you heard under that PIN number, were they

24   criminal in nature?

25   A.   No.

1    Q.   As a result of listening to those calls, did you become

2    familiar with what the defendant's voice sounded like?

3    A.   Yes.

4    Q.   Now I think you told us you'd also spoken with the

5    defendant face to face on a couple of occasions.

6    A.   Yes.

7    Q.   Did you attempt to try to locate other calls involving

8    the defendant from the jail that were not associated with his

9    PIN number?

10   A.   Yes.

11   Q.   How could you do that?

12   A.   We have a computer system that we can access -- when we

13   want to access the phone calls, we can put in specific dates,

14   we can put in the inmate's name, also their data number.  We

15   can also search by telephone numbers that they've called in

16   the past.

17   Q.   So in this case, how did you go about trying to locate

18   other calls by this defendant that were not on his PIN?

19   A.   I noted several phone numbers that he consistently

20   called, one being to his brother, the other being to his

21   girlfriend -- I suppose you want to call her a girlfriend.

22        So I can take those phone numbers, put them into our

23   computer system and it will show every phone call that's been

24   made from the Correctional Center to that number.

25   Q.   All right.  So did you, in fact, find other calls not

1    under the defendant's PIN that were common to numbers the

2    defendant had been calling using his own PIN?

3    A.    Yes.

4    Q.    Did you listen to those calls?

5    A.    Yes.

6    Q.    Were you able to identify the defendant as a participant

7    in any of those calls?

8    A.    Yes.

9    Q.    How could you tell it was the defendant?

10   A.    Number one, his voice.  There are several phone calls

11   where he will call his brother, he refers to him as Bro.  They

12   make reference to his mom.

13        One phone call -- there's a call that's made, and they --

14   the person that's being spoken to says "Diablo".

15   Q.    Now during the calls that you listened to trying to

16   identify the defendant, were there any references to this

17   robbery that you were investigating?

18   A.    Yes.

19   Q.    Did that factor into your identification of the

20   defendant?

21   A.    Yes.

22   Q.    When you had personal contact with the defendant, did he

23   admit being at the scene?

24   A.    Yes.

25   Q.    But he denied being part of the robbery --

1    A.    Correct.

2    Q.    -- fair to say?

3    A.    Yes.

4    Q.    During the calls that you listened to, referring to this

5    incident that was reported as a robbery, the person that you

6    believe was Mr. William, was he talking about the robbery in

7    the third person, that is, "he did that" or someone else did

8    something?

9    A.    He was referring in the first person, talking about

10   himself and the other people that he was talking to.

11   Q.    During the calls you listened to connected to

12   Mr. William, did you also hear any descriptions of trying to

13   avoid detection using the PIN system?

14   A.    Yes.

15   Q.    Can you give us an idea of what you heard?

16   A.    There would be -- for instance, there's one phone call

17   saying that -- Mr. William says, I'm quoting, "This ain't on

18   my shit, so it's okay," talking about the phone call.

19         There's one person that says, "Don't talk about it now."

20   Then again, "It's cool, I'm not on my," quote, "shit," meaning

21   his phone call -- or his phone time.

22   Q.    Is that a reference to not using his own PIN?

23   A.    Yes.

24   Q.    Well, do you have Exhibit Numbers 13A through D in front

25   of you?

1    A.    Yes.

2    Q.    Are those a series of disks with recorded jail calls on

3    them?

4    A.    Yes.

5    Q.    And then also do you have an Exhibit 16 in the front of

6    you as well?

7    A.    Yes.

8    Q.    Is that another disk with a jail call on it?

9    A.    Yes.

10   Q.    The originals of each of those calls that are on 13A

11   through D and also on 16, did you listen to them?

12   A.    Yes.

13   Q.    Did you identify the defendant as one of the

14   participants?

15   A.    Yes.

16   Q.    Are those accurate recordings?

17   A.    Yes.

18          MR. HIGGINS:  Offer Exhibits 13A through D and 16.

19          MR. SHAPIRO:  There's no objection to those, your

20   Honor.

21          THE COURT:  Exhibits 13A, B, C and D and Exhibit 16

22   are received.

23   BY MR. HIGGINS:

24   Q.    Do you have Exhibits 14 and 15 in front of you as well?

25   A.    Yes.

1    Q.   Is it your understanding that those are two groups of

2    selected phone calls that are subsets of the ones we've just

3    talked about?

4    A.   Yes.

5    Q.   And did you listen to those calls on Exhibits 14 and 15?

6    A.   Yes.

7    Q.   Did you initial the disk as well?

8    A.   Yes.

9    Q.   And are those accurate recordings of some selected calls

10   from the larger group in the Exhibits 13A through D and 16?

11   A.   Yes.

12            MR. HIGGINS:   Offer Exhibits 14 and 15.

13            MR. SHAPIRO:   There's no objection to those, your

14   Honor.

15            THE COURT:   Exhibits 14 and 15 are received.

16   BY MR. HIGGINS:

17   Q.   Now, with respect to the calls, did you also generate

18   reports based on your review of the calls?

19   A.   Yes.

20   Q.   Do you have Exhibits 11 and 12 in front of you?

21   A.   Yes.

22   Q.   What are 11 and 12?

23   A.   These are supplementary reports that I completed.  These

24   summarize all the phone calls that were offered in the

25   previous exhibits.

1        MR. HIGGINS:  Offer 11 and 12.

2        MR. SHAPIRO:  No objection to those two exhibits,

3   your Honor.

4        THE COURT:  Exhibits 11 and 12 are received.

5   BY MR. HIGGINS:

6   Q.   Let me direct your attention to the latter part of May of

7   this year, specifically May 24 of this year, and ask, did you

8   check a calendar to see which day of the week that fell on?

9   A.   May 24th was a Tuesday.

10  Q.   And May 24, is that the same date that's referred to as

11  the last entry on that timeline, Exhibit 1?

12  A.   Yes.

13  Q.   Is it your understanding that there was a meeting that

14  occurred that day in connection with this case?

15  A.   Yes.

16  Q.   And what's your understanding of who participated?

17  A.   The Douglas County Attorney Robert MacTaggart, Josh

18  McCoy, and another person named Jerome Green.

19  Q.   Now this Josh McCoy, is it your understanding that was

20  the same person that you yourself had had contact with?

21  A.   Yes.

22  Q.   Do you know what time of day or night this meeting was

23  supposed to have happened?

24  A.   I believe it was one o'clock.

25  Q.   And what's your understanding of the purpose of that

1    meeting?

2    A.    That Josh McCoy and Jerome Green wanted to come in and

3    admit to doing the robbery that Diablo was under the arrest

4    for.

5    Q.    Is it your understanding that Mr. McCoy did, in fact,

6    give a statement during that meeting?

7    A.    Yes.

8    Q.    And likewise Mr. Green the same?

9    A.    Yes.

10    Q.    But as far as the details of what was discussed,

11    obviously you weren't there.

12    A.    Correct.

13        (Off-the-record discussion had.)

14            MR. HIGGINS:  Nothing further of this witness at this

15    time.

16            THE COURT:  Cross-examination?

17            MR. SHAPIRO:  Yes, thank you, your Honor.

18                          CROSS-EXAMINATION

19    BY MR. SHAPIRO:

20    Q.    Detective, is it accurate that the party wearing the red

21    sweatshirt took the wallet?

22    A.    Yes.

23    Q.    Do you know at what point during the altercation with the

24    victim that that took place?

25    A.    The victim indicates when he was on the ground.  At what

1    point that was, I don't know.

2    Q.   All right.  It's true that there was some altercation

3    going on between the victim and the other two suspects or

4    defendants in this robbery/assault before Mr. William is

5    involved, if at all, true?

6    A.   Yes.

7    Q.   And after the victim and the two other suspects are

8    involved in some altercation, you see Mr. William leave the

9    store, go to his vehicle, and then cross back to wherever the

10   altercation is going on, true?

11   A.   Yes.

12   Q.   Do you have any information you can tell the Court with

13   certainty at what point the guy in the red sweatshirt took the

14   wallet?

15   A.   No.

16   Q.   You don't know if it was before or after Mr. William

17   joined the group, if you will?

18   A.   Correct, I don't know that.

19   Q.   Who drove the vehicle, the suspect vehicle to the tobacco

20   and phone store?

21   A.   Diablo William did.

22   Q.   Okay.  So the fact that he was the driver leaving is not

23   anything unusual, true?

24   A.   True.

25   Q.   I mean, when you drive someplace and park your car,

1    you're usually the one that takes it and leaves, right?

2    A.   Usually, yes.

3    Q.   As far as you're aware, my client, Mr. William, has not

4    been charged in state court with any crime beyond the robbery,

5    true?

6    A.   True.

7    Q.   No tampering or conspiracy to produce witnesses or

8    anything like that, right?

9    A.   As of -- yeah, right, not yet.

10   Q.   When did you come into all this information about this

11   conduct on the phone and everything?

12   A.   I don't know the exact date.

13   Q.   Approximately.

14   A.   Late March.

15   Q.   Okay.

16   A.   Mid March.

17   Q.   We're in July.

18   A.   I'm sorry?

19   Q.   And we're now in July?

20   A.   Yes.

21   Q.   He hasn't been charged yet, has he?

22   A.   No.

23   Q.   Are you aware of the circumstances of how Mr. William was

24   picked up or arrested on this state warrant?

25   A.   Yes.

1    Q.   How?

2    A.   He made arrangements through his -- I believe it's called

3    his pretrial officer through the federal court that he would

4    come in to speak with him on a set date and time.

5    Q.   And they were there to then pick him up on the warrant?

6    A.   Yes.

7    Q.   Is that kind of like turning himself in?

8    A.   No.

9    Q.   No?  He didn't know he was going to be arrested?

10   A.   No.

11   Q.   Did James Fitzgerald -- he's the victim -- one of the

12   victims, true?  No, he's the employee, excuse me.

13        James Fitzgerald, did he identify my client at the scene

14   at all?

15   A.   No.

16   Q.   Did ███████████, the victim of the assault and robbery,

17   identify my client as participating in any way?

18   A.   No.

19   Q.   Thank you, Detective.

20        MR. SHAPIRO:  That's all the cross, your Honor.

21        THE COURT:  Redirect?

22                        REDIRECT EXAMINATION

23   BY MR. HIGGINS:

24   Q.   I'd like to ask you, Detective, about one topic that you

25   were just questioned about, and that is, specifically about

1    there being an altercation before the defendant got involved.

2    Do you recall being asked about that?

3    A.   Yes.

4    Q.   I'd like to flesh that out a little bit, if I may, about

5    the defendant being involved.

6         From your investigation, was there any involvement by

7    this defendant that preceded the physical assault that started

8    with these other two individuals, the person in the gray and

9    the person in the red?

10   A.   Yes.

11   Q.   Describe for us what that is.

12   A.   My investigation showed that the two victims were making

13   a purchase inside the Kwik -- or inside the Tobacco & Phones 4

14   Less.  Diablo William is seen on the video walking up behind

15   the two victims.  They're paying for merchandise at the cash

16   register.  And Victim Number 1 pulls out a wallet which

17   contains $900 in cash.  He described these being mostly 20s

18   and a few 10s.  So it was a large wad of money.

19        Diablo William is seen on videotape looking -- walks up

20   directly behind the victim, looks over his shoulder and into

21   his wallet.

22        Within ten seconds, he goes back out to the vehicle that

23   he arrived in where the other two suspects are at.  He's seen

24   at the passenger -- front passenger door.

25        Then he goes back in the Kwik Shop -- back into the

1    Tobacco & Phones 4 Less.  The victims are walking out as

2    Diablo is walking back in so they're passing each other.

3         The victims walk behind the vehicle that Diablo was

4    driving.  And within five seconds of them passing the vehicle,

5    that's when the two other occupants of the Ford Escape get

6    out.  And they walk to the east area of the parking lot, out

7    of the camera view, and that's where the assault and robbery

8    takes place.

9    Q.   Now, the vehicle that the defendant and these other two

10   individuals arrived in and leave in, how is it parked in

11   relation to the front of the store?

12   A.   It was parked directly in front of the store.  It was

13   backed into a parking stall.

14   Q.   Now, from the video, you said that you could see

15   Mr. William reentering the store and these two victims walking

16   out more or less simultaneously.

17   A.   Yes.

18   Q.   From one of the video shots, can you actually see a

19   reflection of inside the store?

20   A.   Yes.

21   Q.   Can you see at that moment you're talking about what the

22   defendant -- excuse me, what the victims are doing, that is,

23   walking?

24   A.   Yes.

25   Q.   All right.

1    A.    You --

2    Q.    That moment you're talking about when they pass one

3    another inside the store, Mr. William, are you able to see

4    what he does in the reflection?

5    A.    Yes.

6    Q.    What does he do?

7    A.    He looks at the victims as they pass.  He stops -- pauses

8    and turns behind his shoulder to look to where the vehicle was

9    in the parking lot and where the victims were going behind the

10   vehicle.

11   Q.    So passing one another, Mr. William, there's a pause and

12   he looks back over his shoulder in the direction of the

13   victims; fair to say?

14   A.    Yes.

15   Q.    All right.  And this is after having gone out to the

16   vehicle and having contact with the passenger side that you

17   just described?

18   A.    Yes.

19   Q.    Then Mr. William, can you see him on the video apparently

20   making a purchase?

21   A.    Yes.

22   Q.    What do you see Mr. William do, if anything, while he's

23   making that purchase?

24   A.    He's obviously paying for the merchandize.  But while

25   he's doing that, he's also looking back over his shoulder, out

1    the window to where the vehicle is and also to the east.

2    There's windows along the whole front of the store, also to

3    the east of where the vehicle was where the assault is taking

4    place at that time.

5    Q.   Okay.  You could see him looking in that direction?

6    A.   Yes.

7    Q.   And you were just telling us about the windows in the

8    store, and I should have asked you that.

9         From the counter where Mr. William made the purchase, can

10   one see -- is there a view of where the victim's vehicle was?

11   A.   Yes.

12   Q.   Is the victim's vehicle -- is that the general location

13   of where the assault and robbery occurred?

14   A.   Yeah, to the east of the vehicle in the same parking lot.

15   Q.   Okay.  Visible from the location where Mr. William was?

16   A.   Yes.

17   Q.   And then I think you told us that the vehicle parked in

18   front of the store was backed in --

19   A.   Yes.

20   Q.   -- is that right?

21   A.   Yes.

22   Q.   The victims, when they walked, did they walk in front of

23   this truck that's backed in or do they walk behind this truck

24   that's backed in?

25   A.   They walk behind the truck, between the truck and the

1    building, on the sidewalk.

2    Q.   From the video, do you see any physical indications on

3    the part of either of these reported victims that they're

4    having any contact or interaction of any kind with the two

5    individuals who get out of this SUV, the red top and gray top?

6    A.   You can see on the video and there's no interaction with

7    the victims to the suspects.

8    Q.   Are the victims doing anything other than simply walking,

9    at least as is apparent from the video?

10   A.   No.

11   Q.   Lighting up a cigarette?

12   A.   No.

13   Q.   Striking a match?

14   A.   No.

15   Q.   Talking to anyone, turning toward anyone that you could

16   see?

17   A.   No.  Eyes are straight and they're walking forward.

18   Q.   And then once those two victims passed behind this SUV,

19   how long does it take before these two occupants of the SUV

20   exit and head in the direction the victims went?

21   A.   Within five seconds, three to five seconds.

22   Q.   So, when you're asked about any involvement by this

23   defendant prior to the time the first blow is struck, at least

24   as reported to be struck by someone wearing gray or someone

25   wearing red, does your investigation show any involvement by

1    the defendant up to that time?

2    A.   Yes.

3    Q.   The factors you've just described for us, are those parts

4    of the evidence that you referred to in saying yes, he had

5    involvement?

6    A.   Yes.

7         (Off-the-record discussion had.)

8    BY MR. HIGGINS:

9    Q.   Let me ask you about what one can see on the video toward

10   the end of the incident, all right?

11   A.   Okay.

12   Q.   Can you see these three individuals who had got out of

13   the SUV get back into the SUV?

14   A.   Yes.

15   Q.   Can you describe -- I want to ask you -- I was going to

16   ask you to describe the manner in which they get into the SUV,

17   but you can see that on the video.

18   A.   Yes.

19   Q.   The fact that these three individuals flee the scene --

20        MR. SHAPIRO:  Object to the form.  It's not done yet

21   but -- I'll wait until he finishes.  Assumes facts not in

22   evidence.

23        THE COURT:  All right.  You can rephrase now if you

24   would.

25        MR. HIGGINS:  Now is a good time to rephrase it.  I

1    will do that, your Honor.  Thank you.

2    BY MR. HIGGINS:

3    Q.   The fact that these three individuals leave the scene

4    with such haste as is shown on the video, does that have any

5    bearing on your conclusion that the defendant's involved?

6            MR. SHAPIRO:  Objection.  It's pure speculation on

7    his part, and it's not relevant what he personally would

8    think.

9            THE COURT:  Sustained.

10   BY MR. HIGGINS:

11   Q.   What you saw on the videotape concerning the manner in

12   which these three individuals left, did that factor into your

13   decision to seek a warrant for the arrest of the defendant?

14   A.   Yes, part.

15           MR. HIGGINS:  Nothing further at this time.

16           THE COURT:  All right.  Thank you, Detective.  You

17   may stand down.

18           THE WITNESS:  Thank you, Judge.

19           THE COURT:  Any further witnesses, Mr. Higgins?

20           MR. HIGGINS:  No, your Honor.

21           THE COURT:  All right.  And any further evidence?

22           MR. HIGGINS:  The only thing I would ask, your Honor,

23   is that the Court take judicial notice of the initial

24   presentence report and the timing with which it was issued.

25   It's got a cover e-mail on it that reflects that it was sent

1  to counsel, that is, the original presentence report, February

2  22 of this year; and then the revised presentence report, I

3  ask you to take judicial notice of the time that was issued,

4  which was March 17 of this year.

5      THE COURT:  I will take judicial notice of those

6  facts.

7      MR. HIGGINS:  Nothing further, your Honor.

8      THE COURT:  Any evidence, Mr. Shapiro?

9      MR. SHAPIRO:  Evidence?  No, your Honor.

10     THE COURT:  All right.

11   Argument, Mr. Higgins?

12     MR. HIGGINS:  At this point, your Honor, are we

13  limiting our comments to the obstruction enhancement I'm

14  seeking and acceptance, or is this allocution overall?

15     THE COURT:  Just on the objections.  So it's just on

16  the obstruction of justice and the acceptance of

17  responsibility.

18     MR. HIGGINS:  Yes, your Honor.

19   With respect to the obstruction, our position is that it

20  is probable that the defendant obstructed justice with respect

21  to his federal sentencing.

22   And I've directed the Court's attention to various

23  segments of the calls that we've not played today, but they're

24  in evidence, where the defendant is specifically referring to

25  the fact that he wouldn't be so worried about this robbery but

1  for the fact that it's going to be used in his federal

2  sentencing.

3      What he's trying to do is manipulate his federal

4  sentencing by manufacturing evidence, by attempting to bribe

5  and otherwise influence witnesses.  And for those reasons, we

6  believe that this conduct that postdates, that happened after

7  this robbery, are the grounds for a two-level obstruction

8  enhancement.

9      I understand that that's subsumed within career, but

10  those same factors, I submit, also bear on whether or not he's

11  accepted responsibility.

12      With respect to that topic, I think simply a finding of

13  probable cause by the state court is a basis on which this

14  Court can likewise find probable cause to believe the

15  defendant was involved in committing that robbery.  Leave

16  aside, even for the moment, the calls, although those calls do

17  add to the probable cause -- I think much more than probable

18  cause -- as to his involvement in the robbery itself.  Why

19  manufacture evidence if you weren't involved; in fact, it was

20  other people who were committing this?

21      So that's our position with respect to those two issues.

22          THE COURT:  Mr. Shapiro, as Mr. Higgins noted, the

23  obstruction of justice enhancement is really subsumed in the

24  career criminal calculation.  And so, I will sustain your

25  objection to the career -- excuse me, to the obstruction of

1    justice enhancement.

2         And you can argue on the issue of acceptance.

3         MR. SHAPIRO:   Thank you.

4         Well, I know there's some burden on me, but we kind of

5    did this for obvious reasons in this manner, Judge, but for

6    purposes of trying to meet some burden or showing the hurdle

7    the government has to overcome, I'd ask you to take judicial

8    notice of filing number 29.  That is the defendant's petition

9    to enter a plea of guilty.  Within that document he has

10   clearly accepted responsibility.  He pled guilty.  There was

11   no plea agreement, but under that document and the hearing

12   that day he pled guilty.  He admitted to the conduct for this

13   charge.

14        What I find is consistent throughout most of the

15   government's presentation here is none of these events have

16   anything to do with this case here in federal court.

17        Now Mr. Higgins makes a slight statement that on one of

18   the recordings Mr. Diablo William is concerned about the

19   impact that this might have on his federal case and that's why

20   Mr. Higgins thinks in part that's why he's doing this.

21        But I don't think it really matters under the law what he

22   really thinks, your Honor.  We're a body of men and women of

23   law.  We follow the law.

24        The law basically says under 3E1.1 that in determining

25   whether he qualifies, subsection (a) the first one, if he

1    truthfully admitted the conduct.  He did.  He hasn't tried to

2    withdraw his plea of guilty.

3        I think the government is going to rely probably on

4    subpart (b) which says voluntary termination or withdrawal

5    from criminal conduct.

6        But if you go through every other subpart contained in

7    there, none of those go against the defendant.  And

8    specifically application note number 3, basically says an

9    entry of a plea of guilty prior to trial, combined with

10   truthfully admitting the conduct compromising [*sic*] the

11   offense of conviction, some other language, will constitute

12   significant evidence of acceptance of responsibility for this

13   subsection.

14       Now, there's some language beyond that which Mr. Higgins

15   will try to fit this is, but that is substantial evidence in

16   his favor.  There is nothing in the record that shows he has

17   done anything to withdraw his plea of guilty, not accept the

18   conduct here, in spite of what Mr. Diablo William may have

19   thought on one call the government is interpreting, his

20   conduct that you just heard about, has zero to do impact-wise

21   with this case.  Perhaps it does on some state level, but my

22   client, as we've heard, has not been charged with any

23   tampering or any other related conduct beyond that.

24       He is presumed innocent.  There's a much higher standard

25   to convicting a person in our country as you are aware than a

1    probable cause finding at a preliminary hearing in state

2    court. So he still has not been convicted of the actual

3    discharge.

4        But, even shading it in the government's favor, I just

5    think under the rules as we look through them, your Honor,

6    there's nothing he's done outside of what Mr. Higgins would

7    put on probably subparagraph (p) -- (b) which is termination

8    of criminal conduct that would overcome the fact that there's

9    substantial evidence in his favor that he has accepted

10    responsibility.

11        What's important to note, if you look at application note

12    4 which follows, conduct resulting in enhancement under 3C1.1,

13    which you just sustained my objection to him getting, would

14    indicate he has not accepted responsibility.

15        So, as you've just indicated and ruled upon, there is no

16    obstruction here the government can point to which would

17    affect this case. His conduct has nothing to do with this

18    case.

19        He pled guilty. His filing at filing number 29 which

20    he's not asked to withdraw clearly shows he's accepted

21    responsibility. And in spite of the information the

22    government has just given you, I think they fall short on

23    overcoming what the rules say, and he gets acceptance for this

24    case.

25        I'd ask you to so find.

1        THE COURT:  Well, to be clear, my finding regarding

2   obstruction is not that the defendant did not obstruct

3   justice.  The objection is largely moot because of the fact

4   that it doesn't affect the guideline calculation.  And I think

5   the evidence that was presented is still something that can be

6   considered when looking at the 3553(a) factors.

7        Regardless, on the acceptance of responsibility issue, I

8   do agree that the government's case is based on application

9   note 1(b), the question of whether the defendant voluntarily

10  terminated or withdrew from criminal conduct or associations.

11       I think the credit for acceptance of responsibility is in

12  part for the purpose of giving defendants some incentive to

13  plead when they are, in fact, guilty so that it does conserve

14  resources of the court and of the prosecutor's office as well

15  as the resources of defense lawyers and witnesses and others.

16       But also it has an aspirational aspect.  If we look at

17  the whole concept of rehabilitation and specific deterrence

18  and the need for isolation or incapacitation of a defendant,

19  all of those objectives of the sentencing statute are

20  diminished somewhat when someone accepts responsibility and

21  turns over a new leaf and says, "Yes, I did wrong; I admit I

22  did wrong; I plan to go straight now; I plan to follow the

23  law."

24       We are hoping that that repentance means that there's not

25  as great a need for further rehabilitation programs and

1     further specific deterrence and the isolation or

2     incapacitation that is needed for the protection of society.

3     We're hoping all those objectives are somewhat diminished.

4          When someone hasn't turned over a new leaf, then that's

5     an indication that, no, we still have the need for all of

6     those objectives to be served.

7          And I often tell people who get pretrial release it's a

8     golden opportunity to demonstrate that you have made a change.

9     And if you obey the law, you obey the rules of pretrial

10    release, you follow the directions of the probation officer,

11    you get employment, you follow through with whatever

12    counseling and therapy is directed, you meet your family

13    obligations, those are a huge indication that you're making

14    progress and that a sentence below the guideline range may be

15    warranted.

16         But, on the other hand, if someone's out on pretrial

17    release and that person demonstrates that he's not staying out

18    of trouble, he's in the association of people who are going to

19    get him into trouble or he can't obey the law or follow the

20    directions of the probation office, then that also is going to

21    be taken into consideration.

22         And here, I recognize it's actually the defendant's

23    burden to show that he is entitled to acceptance of

24    responsibility.  And I appreciate the fact he pled guilty and

25    saved the Court resources of going to trial.

1    But here the government has actually more than met its

2    burden, to the extent it has any, in that the government has

3    demonstrated by a preponderance of the evidence that the

4    defendant was involved in continuing criminal activity.  And

5    that, in my opinion, means that the defendant has not accepted

6    responsibility under the letter and the spirit of the

7    guideline.

8    So, I will deny the objection regarding acceptance of

9    responsibility.

10   The advisory guidelines are as follows:  Base offense

11   level under section 2D1.1(a)(5)(C)(8) is level 24.  The

12   adjusted offense level is level 24.  And we're talking about

13   both counts here at this point in time that are grouped, for a

14   total offense level of 24.

15   We then apply the Chapter Four enhancement because of the

16   defendant's status as a career offender, and the level is 34.

17   The defendant's criminal history category is category VI.

18   The guideline provision for Counts I and II each is 262

19   months to 327 months.  The supervised release range is four to

20   five years.  Probation is not authorized.  The fine range is

21   $17,500 to $2 million.

22   There's a notation here of community restitution in the

23   sentencing recommendation, but that was an error.  And that's

24   not something that's recommended in this case.  The special

25   assessment mandated is $200.

1     Mr. Higgins, did you receive the sentencing

2  recommendation?

3          MR. HIGGINS:  I did, your Honor.

4          THE COURT:  Mr. Shapiro, did you receive that and

5  discuss it with your client?

6          MR. SHAPIRO:  I did and we did.

7          THE COURT:  Okay.  And I understand that Mr. Higgins

8  may be proposing a sentence below the -- excuse me, above the

9  lowest end of the sentencing guideline range.  The probation

10  office has recommended a sentence at the lowest end, and that

11  the terms for Counts I and II run concurrent.

12     I'll hear allocution starting with Mr. Shapiro.

13          MR. SHAPIRO:  Thank you, Judge.

14     I think also you'll note, there was a filing also, an

15  amended statement of position where the defendant asked the

16  Court to consider sentencing consistent with the FSA which was

17  promulgated and is in effect as of October of 2010.

18     And it makes a difference to Mr. William on some level,

19  Judge.  I believe under the current FSA, that the statutory

20  minimum changes.  Presently as charged from the date of this

21  offense conduct which I know Mr. Higgins will point out the

22  date of his offense conduct predates it, but it was a five to

23  40.

24     I believe my review of the current statutory penalties

25  with respect to this amount of crack cocaine, under 28 grams

1    is a zero to 20.  Mr. William thinks it's zero to five, but I

2    think it's a zero to 20.

3         And under the career offender calculations, when you go

4    there, it actually makes the base offense level a 32 as

5    opposed to a 34.

6         I received some information probably within the last 24

7    or 48 hours that it looks like these are going to be mandated,

8    the FSA, to be applied retroactively as of November 2011.  So

9    it's this counsel's position that we are either going to apply

10   that to Mr. Diablo William today and those similarly situated,

11   or we're coming back in November, if I'm correct at what I

12   see, and we'll be making those adjustments.

13        Either way, I ask the Court for many reasons, all the

14   factors and laws and rules that you have, that you consider a

15   calculation based on the FSA.  The current level 26 as of

16   October 2010 is 28 grams to, I believe, 112 grams.  That is

17   now the required level, one ounce, to bring about a five-year

18   mandatory minimum, the five to 40.  The amount of crack

19   cocaine at issue here certainly is below that.  And I think

20   the government acknowledges that obviously.  It's in the

21   report.  It is no longer a five to 40 as we sit here.  It was

22   at the time Mr. Higgins indicted him.

23        So part of my allocution to this Court obviously is for

24   you to give every consideration and break to Mr. William.

25   He's looking at a tremendous amount of time as is recommended

1    at 262 months.  That's 22 years, your Honor.  Two months shy,

2    but it's 22 years.  Mr. Higgins has made some overtones that

3    he thinks it should be more than that.  And I realize he has a

4    job to do, it's his position to argue that.

5        But that's a long time.  We're talking about 22 years in

6    prison for less than an ounce of cocaine which the laws today

7    as we sit here are being treated differently through Congress

8    and the courts because we know when these guidelines were

9    promulgated, they were unfair.  They were wrong and they've

10   been changed now.

11       And this defendant should get the benefit of what the

12   current law and what all the smart people think these

13   guidelines in crack cocaine should reflect, not the time, as

14   Mr. Higgins will argue, the offense conduct, because it does

15   predate the enactment of the statute.  I'm aware of that.

16       But I think you have the authority to sentence

17   Mr. William at any level that you want.  And I think first and

18   foremost, you should consider the calculation as a level 32

19   for the career offender.  I believe that brings his guideline

20   range -- well, I had hoped he got acceptance on there, so it

21   would go to -- it's still 210 months, your Honor.

22       You know, that is -- you want to talk about deterrence,

23   specific or otherwise, that's for most of the rest of his

24   productive years anyway.  And I just don't know why you have

25   to give him more time than that.

1        I think the law allows it, I think the facts allow it.

2   His repent, the effect on his family, it's more than obvious.

3   And you should give this person some opportunity to have the

4   benefit of the law as it's now being handed out to every other

5   person in this country.

6        That's it.

7        THE COURT:  Thank you, Mr. Shapiro.

8        Mr. William, if you want to take a moment to compose

9   yourself, that's fine.

10       MALE SPECTATOR:  Snap out of it, dude.

11       THE COURT:  I want to give you an opportunity to

12  speak when you're ready.

13       Mr. William, is there anything that you would like to

14  say?

15       THE DEFENDANT:  Your Honor, I just want to say -- I

16  would like to apologize to my family -- my kids and my family,

17  please, the mothers of my kids.  And I'm sorry for making

18  these mistakes.  I'm sorry I'm not going to be there for you

19  all when you all really need me.

20       I'd like to say to you, your Honor, that I did change and

21  I have changed and I'm still changing.  And I know that I

22  probably shouldn't have been around whoever I was around.  But

23  at the time of the robbery when it took place, I was in the

24  store.  I didn't give no signal, I didn't do anything like

25  that.  I didn't take no money from nobody or nothing like

1    that.

2        At the time of my indictment, I was over -- off the Gulf

3    working 90 to 120 hours a week, every day, helping clean up

4    the oil spill.  I was blessed with that job through the people

5    of Impact One who's currently still supporting me and my

6    change.

7        I know that I have made mistakes.  I know that.  I also

8    know that I didn't -- I wasn't -- I'm not trying to justify

9    what I done, but the guide -- for $200, I'm about to be sent

10    away from my family.

11        THE COURT:  Thank you, Mr. William.

12    Mr. Higgins?

13        MR. HIGGINS:  Judge, obviously what's driving this

14    defendant's sentence is the career offender guidelines.  And

15    you have discretion obviously to depart -- to deviate from

16    those guidelines if you so choose.

17        I'm not asking for an upward enhancement or upward

18    variance from the guideline range.  But I think it's important

19    to remember that what brings the defendant here today is not

20    the two half ounces of crack that he sold in connection with

21    this investigation in this particular case to a CI.

22        We're talking about, in terms of specific deterrence,

23    this defendant, his priors reflected in the presentence report

24    are for distribution of controlled substances, he's done it

25    before, and for robbery.  He's been convicted of both of those

1    in the state system.

2         So in terms of specific deterrence, I submit that a

3    sentence within at least the guideline range is an appropriate

4    one for that 3553(a) factor.

5         From the sequence of events that occurred after this

6    robbery that we've laid out in the hearing today, I think it's

7    plain, especially if one listens to the calls, that what

8    happens thereafter is an attempt to pervert justice, is an

9    attempt by this defendant to manufacture evidence, to

10   manipulate witnesses, to try to bribe and otherwise influence

11   the reported victims in the case to his own ends, because he

12   knew that that was going to have a bearing on his federal

13   sentence.  He's trying to manipulate the facts and the

14   evidence that would come before this Court in connection with

15   his federal sentence.

16        With respect to the Fair Sentencing Act, I agree with

17   counsel that Mr. William's conduct predates August 3 when that

18   statute took place.  I disagree with counsel that you have the

19   authority to overlook, to ignore, to not follow the statute

20   that was in effect at the time the defendant committed these

21   offenses.

22        Congress, as interpreted by the Eighth Circuit in

23   particular, has indicated the Fair Sentencing Act is not

24   retroactive.  So the defendant's statutory range in point of

25   fact is not zero to 20, it is a five to 40.  And so therefore,

1       the presentence report is calculated accurately.

2           I agree with counsel that there have been an indication

3       from the Sentencing Commission here just recently that the

4       Sentencing Commission intends to make its guideline

5       calculations retroactive.  But of course, the Sentencing

6       Commission has no authority to override the congressional

7       power as reflected in the statute and interpreted by the

8       Eighth Circuit.

9           So, regardless of what the Sentencing Commission does,

10      we're still under the regime of pre August 3, 2010, the

11      statutes and penalties that were in place at that time.

12          Even assuming that we weren't, and even assuming it's a

13      zero to 20 under the new statute, the defendant's range is

14      still 210 to 262 months.  I think the Court should sentence

15      within that range.

16          But I don't think that is the appropriate range.  I've

17      talked about specific deterrence.  I've talked about also

18      really general deterrence and what the defendant has attempted

19      to do to manipulate the evidence that this Court would hear.

20      I think that general deterrence requires a sentence within the

21      advisory guideline range based upon that contact.

22          And I think for those reasons, especially the conduct

23      that postdated the reported robbery, that separates this

24      defendant from every other defendant who failed to accept

25      responsibility after committing a five to 40 offense.

1    THE COURT:  You said one thing that confused me, you

2    said even if the statutory range were zero to 20 years, the

3    guideline would be up to 262 months?

4    MR. HIGGINS:  That's my calculation, Judge.  And let

5    me flesh that out, if I may.

6    THE COURT:  All right.

7    MR. HIGGINS:  Under the calculation by the

8    presentence -- by the probation office currently, under the

9    career offender guidelines, since his sentence is --

10   sentencing range, the maximum, is 25 years or more, that

11   results in a base offense level 34.  That's where we are

12   today.

13   Defendant is arguing for retroactive application of the

14   Fair Sentencing Act that would affect his career offender

15   correct.  Just assume for a second that's the proper approach.

16   I don't think it is; let's assume that it is.  In that case,

17   his underlying offense would be, hypothetical, zero to 20

18   years.

19   THE COURT:  How do you get a guideline high end then

20   of 262 months?

21   MR. HIGGINS:  Well, zero to 20 years, I'm looking at

22   section 4B1.1 of the guidelines, the career offender for a 20

23   years or more, so 20, zero to 20, 20 years or more, that

24   results in a base offense level of 32.  My reference of the

25   guidelines anyway, it's a 32.  32, minus zero, if there's no

1    acceptance of responsibility, that means a total offense level

2    of 32.  So an automatic --

3         THE COURT:  Maybe you're saying the high end of the

4    guideline would be above the statutory maximum, but I couldn't

5    sentence above the statutory maximum.

6         MR. HIGGINS:  No, of course you can't.

7         THE COURT:  I just was confused that the high end of

8    the guideline was 262, but that would be outside the statutory

9    maximum.

10        MR. HIGGINS:  Right.

11        THE COURT:  Okay.

12        MR. HIGGINS:  All right.  Fair enough.

13     So you're right, properly stated it should be 210 to 240.

14        THE COURT:  Okay.

15        MR. HIGGINS:  The statutory maximum.

16        THE COURT:  I'm with you.

17        MR. HIGGINS:  Which is, of course, binding on the

18   Court and that's what we're asking for, or would ask for but

19   for that statutory range would be an incremental consequence

20   for the defendant's attempt to manipulate the evidence in this

21   court.

22     And I would ask for -- under the guideline calculation,

23   what I would ask for would be 36 months on top of the 262

24   which would be a recommended -- a request for 298 months.

25   But, of course, that exceeds the statutory minimum -- excuse

1   me, the statutory maximum.

2       In this case, what I'm asking the Court to do overall

3   since there's two counts would be to impose a sentence of 298

4   months, which would be the low end of the guideline range,

5   262, with an additional 36 months which would be an

6   incremental consequence for his attempts to manipulate

7   evidence.

8       That's my position.

9       THE COURT:  All right.  Thank you.

10      Well, I don't doubt that the defendant deserves some

11  additional consequence for his bad behavior while out on

12  pretrial release status.  And his behavior is not commendable

13  and I don't condone it.  And we're all disappointed with it,

14  very disappointed.

15      Also, no one gets to a criminal history category VI

16  without substantial criminal activity.

17      So, even though, Mr. William, I know you're distressed

18  with the situation you're under, and your family is

19  distressed, this isn't your first time in the criminal justice

20  system.  You've been in and out a lot and for very serious

21  offenses.

22      Having said that, the guideline range as it exists is a

23  very large amount of time, as Mr. Shapiro noted.  We're

24  looking at a long time for anyone to be serving in prison.

25      I have never sentenced anyone in anticipation of Congress

1    or the guideline commission taking some action in the future.

2    I realize it may be inconvenient for everyone if we have to

3    come back again and go through this again after some change is

4    made.

5        But as a matter of principle, I don't try to second guess

6    or anticipate what Congress or others may do.  I think that

7    that's dangerous to do that.  And it could cause me to treat

8    different defendants inequitably.  So I sentence based upon

9    what the law is at the time of the offense and at the time of

10   the sentencing, and not in anticipation of what may happen in

11   the future.

12       Although I don't disagree with Mr. Higgins' position that

13   some enhancement is warranted based upon the defendant's bad

14   conduct -- and it is serious bad conduct -- because the

15   guideline range provides for such a substantial sentence, I

16   will sentence the defendant at the lowest end of the guideline

17   range.  And I will make that sentence concurrent for both

18   Counts I and II.

19       Accordingly, I impose a sentence of 262 months on Count I

20   and on Count II to run concurrently.  I impose a sentence of

21   three -- excuse me, five years of supervised release on Count

22   I and Count II again concurrent, that will follow the term of

23   incarceration.

24       I will not impose a fine because the defendant does not

25   have the ability to pay and is not expected to become able to

1  pay a fine and because of the burden it would impose on his

2  minor children.

3      I do impose a special assessment in the amount of $200.

4  That's due and payable immediately.  If it's not paid

5  immediately, it will be paid through the Bureau of Prisons'

6  Inmate Financial Responsibility Program with an allocation of

7  50 percent of available inmate institutional funds per

8  quarter.

9      I intend to impose the special conditions of supervised

10 release set out in the sentencing recommendation.  Are there

11 any objections to those, Mr. Higgins?

12         MR. SHAPIRO:  None, your Honor.

13         THE COURT:  Mr. Shapiro?

14         MR. SHAPIRO:  There are none.

15         THE COURT:  The special conditions of supervised

16 release set out in the sentencing recommendation are imposed.

17 The standard conditions will also apply.

18     I recommend to the Bureau of Prisons that the defendant

19 receive credit for time served in federal custody, not what

20 he's serving in state custody in connection with any pending

21 state charges.

22     I do recommend that he be allowed to participate in an

23 appropriate drug treatment program.

24     Mr. William, you do have a right to appeal from this

25 sentence that I've imposed.  Any appeal needs to be filed

1    within 14 days of the filing of the judgment.

2        When we're done with the hearing, the courtroom deputy is

3    going to show you a form that outlines the right of appeal and

4    explains how to file a notice of appeal.

5        I'd like you to read through the form and then sign the

6    signature pad indicating that you've read the form.  Signing

7    the signature pad is not the same thing as submitting a notice

8    of appeal.

9        If you have any question about whether you should appeal,

10   you should discuss the matter with Mr. Shapiro.  The ultimate

11   decision is up to you.

12       Do you have any question for me about your right of

13   appeal?

14       (Off-the-record discussion had.)

15           THE DEFENDANT:  No.

16           THE COURT:  All right.  The defendant is remanded to

17   the custody of the U.S. Marshal to be delivered back to state

18   custody.

19           MR. SHAPIRO:  One final matter, your Honor?  I

20   apologize.

21       Would you make recommendations for Oxford, Wisconsin?  We

22   understand it's merely a recommendation, but if he would

23   qualify for Oxford for communication with family and travel,

24   that would be his request, your Honor.

25           THE COURT:  I will do that.  I'll recommend to the

1   Bureau of Prisons that the defendant be given consideration

2   for placement in its facility in Oxford, Wisconsin so that he

3   can be near home and family.

4          MR. SHAPIRO:  Thank you.

5          THE COURT:  And he's now remanded to the custody of

6   the marshal to be delivered back to state custody for the

7   resolutions of those charges.

8       Anything further, Mr. Higgins?

9          MR. HIGGINS:  No, your Honor.

10          THE COURT:  Anything further, Mr. Shapiro?

11          MR. SHAPIRO:  No.

12          THE COURT:  All right.  Thank you.

13      We're adjourned.

14

15      (Adjourned at 2:55 p.m.)

16

17

18

       I certify that the foregoing is a correct transcript from
19   the record of proceedings in the above-entitled matter.

20

21      ___/s Brenda L. Fauber___            _____7-26-11_____
        Brenda L. Fauber, RDR, CRR                    Date
22

23

24

25

1                          I-N-D-E-X

2

3

4                    Direct  Cross  Redirect  Recross

5    WITNESSES:

6    FOR THE PLAINTIFF:

7    Paris Capalupo              5      9

8    Jim Shields               11     34      37

9

     EXHIBITS:                        Offered      Ruling
10   1.  Timeline of Events             16           16

11   2.  Omaha Police Report            16           16

12   3.  Omaha Police Report            17           17

13   4.  Photograph of Victim           14           15

14   5.  Photograph of Victim           14           15

15   6.  Video from Store                8            8

16   7.  Excerpts from Ex. 6             8            8

17   8.  OPD Report - Def. Interview    22           22

18   9.  OPD Report - McCoy Interview   23           23

19   10. Transcript of 4-1-11 Hearing   26           26

20   11. Supplementary OPD Report       33           33

21   12. Supplementary OPD Report       33           33

22   13A. Recording of Phone Call       31           31

23   13B. Recording of Phone Call       31           31

24   13C. Recording of Phone Call       31           31

25   13D. Recording of Phone Call       31           31

| EXHIBITS: | Offered | Ruling |
|---|---|---|
| 14.  Recording of Phone Call | 32 | 32 |
| 15.  Recording of Phone Call | 32 | 32 |
| 16.  Recording of Phone Call | 31 | 31 |